JAMES S. JEWELL *et al.*

*v.*

THE ROCK RIVER PAPER COMPANY *et al.*

*Filed at Ottawa November 10, 1881.*

1. CORPORATION—*articles of association—evidence that capital stock has been subscribed.* The articles of association of a corporation, certified by the Secretary of State, are *prima facie* evidence of the fact that the full amount of the capital stock required by the articles has been subscribed, and is sufficient proof of that fact until overcome by rebutting evidence.

2. SAME—*subscriber estopped by his fraud from questioning the right to fill up blank as to amount.* If a party signs a subscription book for stock in a contemplated corporation, merely to induce others to subscribe the same, leaving the amount of his own subscription blank, it is but fair to hold that, as to creditors of the company, he thereby impliedly authorizes those empowered to take subscriptions to fill up the blank, and that when done such subscriber will be estopped from questioning their authority to do so.

3. SAME—*fraud in its formation will not affect creditors.* If a new corporation is organized by parties interested in an old one, for the purpose of getting rid of its liabilities and fastening them upon the new company, and the latter, by arrangement with the creditors of the former company, bids off the property of the old company for the amount of its liability, and gives its notes therefor to such creditors, secured by deed of trust, the fraud, if any, on the part of those representing the old company, can not affect the creditors, and these facts will constitute no defence to a suit to compel the stockholders in the new company to pay their unpaid subscriptions to satisfy the liabilities thus assumed by the new company.

4. Same—*creditors not affected by fraudulent arrangements between subscription agent and subscribers.* The creditors of a private corporation organized under the general law of 1872, can not be affected by a mere private understanding between the subscribers and the subscription agent of the company, by which the former are exonerated from the payment of their subscriptions, wholly or in part, contrary to its .terms, nor by the fact that many of the subscribers at the time of subscribing were notoriously insolvent; and such facts constitute no defence to the collection of subscriptions from solvent parties for the benefit of creditors of such company.

5. Same—*inconsistent parol agreement is void.* A parol agreement, made at the time of a written subscription to the capital stock of a private corporation, with some of the subscribers, by the subscription agent, that their subscriptions shall not be collected, or shall be collected only in part, or may be paid in services, being inconsistent with the written contract, is void as to the other subscribers and creditors of the company.

6. Chancery practice—*parties' when concluded by master's report.* Where matters of fact are referred to a master, it is the duty of the parties, when notified, to appear before him and there contest the matter, and if his findings are not correct in their judgment, it is their duty to interpose their objections, so as to afford the master an opportunity to modify his report, if wrong. If on such hearing the master declines to change his report, the objecting party must file exceptions to it when it is filed. When this course is not pursued, and no sufficient reason is assigned for not doing so, the master's report, when approved by the court, ·will in this court be deemed conclusive upon the questions covered by it.

Appeal from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. John A. Jameson, Judge, presiding.

Mr. John H. Hamline, for the appellant James S. Jewell:

1. The full amount of capital stock demanded by the articles of association of the Chicago Publishing Company was never subscribed, and the company was never legally organized in accordance with the act concerning corporations. *Ullman* v. *Havana and Rantoul R. R. Co.* 88 Ill. 521; *Pitchford* v. *Davis,* 5 M. & W. 2; *Bray* v. *Farwell,* 81 N. Y. 600; *Fox* v. *Clifton,* 6 Bing. 776; *Salem Mill Dam Corporation* v. *Ropes,* 6 Pick. 23; *Cabot and West Springfield Bridge Co.* v. *Chapin et al.·* 6 Cush. 50; *Stoneham Brand R. R. Co.* v. *Gould,* 2 Gray, 277; *Littleton Manufacturing Co.* v. *Parker,*

14 N. H. 543; *Old Town and Lincoln R. R. Co.* v. *Veazie,* 39 Maine, 571; *Sanford* v. *Handy,* 25 Wend. 475; Thompson on Liability of Stockholders, sec. 120, and cases cited; *Swartwout* v. *Michigan Air Line,* 24 Mich. 396; *Mokelume Hill Manufacturing Co.* v. *Woodbury,* 14 Cal. 424; *Fire Dept. of New York* v. *Kilp,* 10 Wend. 266.

2.   The appellant is not estopped from showing this. *Cross* v. *Pinckneyville Mill Co.* 17 Ill. 54; *Slocum* v. *Providence Steam and Gas Co.* 10 R. I. 113.

3.   The case being distinguished from the following cases, for the reason that the acts of appellant have given no ground for estoppel, while in the latter cases the defendant has invariably done some act himself affirming the existence of the corporation.   *Rice* v. *Rock Island and Alton Railroad Co.* 21 Ill. 93; *Tarbell* v. *Page et al.* 24 id. 46; *Thompson* v. *Candon,* 60 id. 244; *McCarthy* v. *Lavasche,* 89 id. 275; *Dows* v. *Naper,* 91 id. 44; *Chubb* v. *Upton,* 5 Otto, 666; *Corwith* v. *Culver,* 79 Ill. 502.

4.   The majority of the stock purporting to have been subscribed was fictitious, and hence the capital stock of the Chicago Publishing Company was not fully subscribed, and the company was not legally organized.   Angell and Ames on Corporations, (9th ed.) sec. 86; *McConaby* v. *Centre Turn. Co.* 1 Pa. 426; *Jersey City Gas Co.* v. *Dwight,* 29 N. J. Eq. 242.

5.   Appellants' contract was a conditional one, and the conditions expressed on the face thereof have not been complied with.   Thompson on Liability of Stockholders, secs. 116, 117, 118, and cases cited; *Chase* v. *Sycamore and Courtland R. R. Co.* 38 Ill. 215; *Melvin* v. *Lamar Ins. Co.* 80 id. 459; *Jersey City Gas Co.* v. *Dwight,* 24 N. J. Eq. 242; *McConaby* v. *Centre Turn. Co.* 1 Pa. 426.

6.   Appellant not being a member of the corporation, the books were not evidence against him.   *Chase* v. *Sycamore and Courtland R. R. Co.* 38 Ill. 215.

Mr. WILLIAM C. WILSON, and Mr. DAVID L. ZOOK, for the other appellants:

1. The entire capital stock of the alleged company was never in fact fully subscribed, and until that was done there could be no organization or transaction of business in the name of the company. . *Bray* v. *Farwell*, N. Y. Court of App.; *Ullman* v. *Havana and Rantoul R. R. Co.* 88 Ill. 521.

2. Many of the subscriptions were fraudulent upon the other subscribers. The subscribers were insolvent, and known to be so to appellees. Angell & Ames on Corporations, (10th ed.) secs. 88, 517; 1 Pa. 426.

3. The corporation had no authority to buy the subscription list, good will, and old debts due to the Post and Mail Printing Company. The notes given for the purchase money were *ultra vires*, and imposed no obligation whatever. *Re Saxon Life Ass. Society*, 2 J. & H. 400; on appeal, 1 De G. J. & Sm. 29; on rehearing, 1 H. & M. 672; *Ernest* v. *Nicholls*, 6 H. of L. Cases, 401; *Ashbury Railroad Carriage Co.* v. *Riche*, L. R. 7, Eng. and Irish App. 653; *East Anglican Ry. Co.* v. *Eastern Counties Ry. Co.* 11 C. B. 775; *Re Empire Assurance Co.* L. R. 8 Ch. 340.

4. At the time of the alleged assumption of said indebtedness no stock was held in said corporation by any of these appellants, nor have they ever held or owned any stock, and no liability can be incurred by them or imposed upon them in the absence of stock. *Baker et al.* v. *Admrs. of Backus*, 32 Ill. 79; *Steele* v. *Dunne*, 65 id. 298; Rev. Stat. 282, sec. 8.

5. Unless a subscriber ratifies with a full knowledge, he is not bound. Angell & Ames on Corporations, sec. 517.

6. A false and fraudulent representation by an agent or commissioner, to obtain subscriptions to the stock of the company, will avoid the subscriptions. *Crossman* v. *Penrose Ferry Bridge Co.* 26 Pa. St. 69.

Mr. A. H. LAWRENCE, for the appellees:

The appellants are concluded by the approval of the master's report, as to all the findings of facts by him. The exception by White, after the report was filed, was too late. The report can not be questioned here for the first time. *Reigard* v. *McNeil*, 38 Ill. 401; *Clark* v. *Laughlin*, 62 id. 278; *McClay* v. *Norris et al.* 4 Gilm. 386; *Prince* v. *Cutler*, 69 id. 267; *Pennell* v. *Lamar Ins. Co.* 73 id. 303; *Hurd* v. *Goodrich*, 59 id. 450; *M. E. Church* v. *Jacques*, 3 Johns. Ch. 77.

It was inadmissible for defendants to show that their subscriptions were in fact qualified and limited by parol conditions. *Corwith* v. *Culver*, 69 Ill. 506; *Melvin* v. *Lamar Ins. Co.* 80 id. 456; *Graff* v. *Pittsburg and Steubenville R. R. Co.* 31 Pa. St. 489; *Robinson* v. *Pittsburg R. R. Co.* 32 id. 339; *Downie* v. *White*, 12 Wis. 176; *Mann* v. *Cook*, 20 Conn. 178; *White Mountain R. R. Co.* v. *Eastman*, 34 N. H. 124; *Johnson* v. *Crawfordsville R. R. Co.* 11 Ind. 280; *Blodgett* v. *Merrill*, 20 Vt. 509; *Pickering* v. *Templeton*, 2 Mo. App. 425; *Thornburgh* v. *Newcastle R. R. Co.* 14 Ind. 499.

Every subscription to the capital stock of a company is a separate and independent contract. *Price* v. *Grand Rapids R. R. Co.* 18 Ind. 137; *Conn. and Pass. R. R. Co.* v. *Bailey*, 24 Vt. 465; *Hatch* v. *Dana*, 11 Otto, 210.

Having taken part in the proceedings of the company, paid stock assessments, and in various ways recognized the existence of the company, appellants above named are, by such acts on their part, estopped from questioning the legality of the organization of the company, or their liability as stockholders therein. Thompson on Liability of Stockholders, secs. 162, 163, 164, 165, 170; *Black River and Utica R. R. Co.* v. *Clark*, 25 N. Y. 208; *Maltby* v. *Northwestern Va. R. R. Co.* 16 Md. 422; *Hager* v. *Cleveland & Bassett*, 36 id. 476; *Frost* v. *Walker*, 66 Maine, 468; *Dayton and Cin. R. R. Co.*

v. *Hatch,* 1 Disney, 84; *Corwith* v. *Culver,* 69 Ill. 506; *Central Plank Road* v. *Clements,* 16 Mo. 359.

Appellants having suffered the company to hold itself out to the world as a legally created body corporate, they can not, as against creditors, attack the organization of the company. This can not be done in a collateral proceeding. Angell & Ames on Corporations, secs. 635, 636; *Swartwout* v. *Mich. Air Line R. R. Co.* 21 Mich. 389; *Slocum* v. *Providence Steam Co.* 10 R. I. 112; *Slocum* v. *Warren,* 10 id. 116; *Tarbell* v. *Page,* 24 Ill. 46; *Price* v. *Rock Island and Atchison R. R. Co.* 21 id. 93; *Thompson* v. *Candor,* 60 id. 244; *McCarthy* v. *Lavasche,* 89 id. 270; *Dows* v. *Naper,* 91 id. 44; *Chubb* v. *Upton,* 5 Otto, 665.

This being a suit by creditors against stockholders, to enforce payment of their unpaid stock subscriptions, it is no defence for such stockholders to say they were induced to subscribe by false and fraudulent representations made to them by the company, or by Willard, its agent. *Ogilvie* v. *Knox Ins. Co.* 22 How. 380; *Upton* v. *Tribilcock,* 91 U. S. 45; *Chubb* v. *Upton,* 95 id. 667; *Payson* v. *Withers,* 5 Biss. 269; *Litchfield Bank* v. *Church,* 29 Conn. 137; *Clark* v. *Thomas,* 34 Ohio St. 46; *Ruggles* v. *Brock,* 6 Hun, 164; *Goodrich* v. *Reynolds,* 31 Ill. 490.

Messrs. Dupee & Judah, also for the appellees.

Mr. Justice Mulkey delivered the opinion of the Court:

This is an appeal from a judgment of the Appellate Court for the First District affirming a decree of the Superior Court of Cook county, in favor of appellees, as creditors of the Chicago Publishing Company, and against the company and certain of its stockholders, to recover from the latter unpaid subscriptions to its capital stock.

The company was organized under the general Incorporation act of 1872, entitled "An act concerning corporations,"

in the latter part of the winter of 1878, with O. A. Willard, since deceased, as its president and business manager. The statement filed with the Secretary of State, as required by the second section of the Incorporation act, shows the company was organized for the purpose of doing a general printing business, including the publication of a newspaper in the city of Chicago, the business place of the company, and that its capital stock was limited to $150,000, being divided into 1500 shares, of $100 each. Its organization, so far as we are able to discover, seems to have been in strict conformity with the statutes. It was evidently the purpose of the promoters of this company that it should, as it subsequently did, supersede the Post and Mail Printing Company, an existing organization then engaged in the same business, proposed to be conducted on a more extensive scale by the new company, under whose management a daily newspaper, known as the "Chicago Post," was then being published, the said O. A. Willard being the president and general manager of that company also.

At the time of the organization of the new company the Post and Mail Printing Company was indebted to various individuals in the sum of $45,000, which indebtedness was represented by forty-five notes of the company, for the sum of $1000 each, and all secured by a deed of trust executed by the company to Arnold Tripp, as trustee, on the entire assets of the concern, ten of these notes belonging to appellee the Rock River Paper Company. Default having been made in the payment of these notes, the trustee, at the instance of the holders, proceeded to advertise for sale the mortgaged property. Pending this advertisement, to-wit, on the 28th of February, 1878, there was a meeting of the directors of the Chicago Publishing Company, at which a resolution was passed by the board authorizing and directing O. A. Willard, the president of the company, to bid at the trustee's sale the sum of $45,000 for the property, franchises, etc., of the Post-

Mail Printing Company, to be paid two years after date, with interest at the rate of ten per cent per annum, payable semi-annually, and to be secured by a mortgage on the property purchased.    This resolution seems to have been adopted in pursuance of an arrangement which had already been made with the holders of the notes of the old company, to the effect that they would accept in payment of the indebtedness of the latter company the notes of the new company, of the character specified in the resolution.    The effects and franchises of the old company were accordingly purchased at the trustee's sale, in pursuance of the above resolution and the understanding with the creditors of the old concern.    The old notes were surrendered, and new ones given to the holders by the new company, which were secured by a deed of trust on the purchased property, as above stated, and from thenceforth the old company abandoned its organization and ceased to do business.    On the 17th of March following, Oliver A. Willard, the president and business manager of the Chicago Publishing Company, died, and from thence until the filing of the bill in this case the stockholders of the company seemed to lose all interest in its success, and its affairs gradually grew worse, until it drifted into insolvency, and all its tangible effects, with the exception of some accounts, were sold under the deed of trust above mentioned, when it ceased to do business, and a receiver, under the present bill, was appointed to wind up its affairs.    The record shows that many of the subscribers to the capital stock were at the time of their subscriptions, and still are, insolvent, and that but a small portion of the stock had been paid in before the commencement of the suit.

Answers were filed by appellants and some of the other defendants, alleging, in substance, the whole of the capital stock had not been subscribed; that many of the subscriptions were colorable, merely, and that the parties making them were notoriously insolvent, of all which appellees had

notice; that the proposed organization of a new company was but a scheme devised by the managers of the old one to saddle the debts of the old concern upon unsuspecting subscribers who might be induced to take stock in the pretended new company, etc.   The other defendants failed to answer, and were regularly defaulted.

The cause was referred to the master, whose report shows the total amount due from all the stockholders, the amount due from the solvent stockholders, the total amount of the company's indebtedness, and the names of the persons having claims against the company, and the amounts due them, respectively; and also, that after exhausting all the debts due from the solvent stockholders there will be an unpaid balance due from the company of $14,473.66, unprovided for. Although such of the stockholders as interposed a defence to the bill were notified to appear before the master, for the purpose of taking such steps as they might deem proper with respect to the report of that officer before filing it in court, none of them appeared before him for such purpose, or took any exceptions to it, until after it was filed in court, and only one of the defendants, namely, appellant Hugh A. White, filed exceptions to it at all.   The report of the master was approved by the court, and a final decree entered in accordance with its findings.   From that decree sixteen of the defendants appealed to the Appellate Court, and the cause was there heard, resulting in an affirmance of the decree of the Superior Court.   All of the defendants seem to have acquiesced in the judgment of the Appellate Court except James S. Jewell, David R. Dycke, Hugh A. White, and Thos. C. Hoag, the present appellants, who bring the record to this court for review.

Various reasons are assigned why the judgment of the Appellate Court should be reversed, none of which are deemed sufficient.

It is first objected that the full amount of capital stock required by the articles of association before it could become a legally organized body, was never subscribed. Assuming this objection, if true, could be made available under the circumstances of this case, of which we deem it unnecessary to express any opinion, we are satisfied, from the proofs before us, the requisite amount of capital stock was subscribed. The articles of association certified by the Secretary of State, afford *prima facie* evidence of the fact, which has not, in our judgment, been overcome by anything appearing in the record tending to establish a contrary conclusion. This part of the controversy is narrowed down to the subscriptions of White, Miller and Culver. So far as the latter is concerned, we find no evidence at all tending to overcome the *prima facie* case made by the certified articles of association. As to Miller and White, they both admit having signed their names to the subscription book, in the list of the other subscribers, but deny having carried out the amount of their subscriptions in figures, and claim that they signed their names for the purpose, simply, of enabling Willard to exhibit them to others in his efforts to obtain subscribers, it being supposed, as we take it, that the mere sight of their names, without anything more, would be a strong incentive to others to subscribe. We frankly confess our inability to perceive the force or plausibility of this theory, however prominent or influential the parties may be. The more natural theory is, that if the amounts of their subscriptions were not carried out at the time, and were purposely left blank, the object in doing so was to enable Willard to represent them as subscribers when they were not, which would have been a palpable fraud on those subscribing through such an influence. It is well known that in becoming a party to an enterprise of that kind one is generally controlled, in a large degree, by the character of those who are, or who are expected to be, identified with it. Any artifice or trick, therefore, tending to mislead a sub-

scriber in this respect would be highly reprehensible in morals, as well as a legal fraud. If, then, appellants signed the subscription book of the company in blank for such purpose, it is but fair and just to hold that as to creditors of the company they thereby impliedly authorized those empowered to take subscriptions to fill up the blanks, and that having been done in this case, as is claimed, appellants are estopped from questioning their authority to do so. The Superior and Appellate Courts both found the requisite amount of stock was subscribed, and that the company was properly and legally organized, and we think the evidence fully warranted them in doing so.

Again, it is claimed that the Post and Mail Printing Company was hopelessly insolvent, and that the organization of the new company was a mere shift or device to relieve those representing the old company and fasten its liabilities upon the stockholders of the new. We see no satisfactory evidence in the record to support this hypothesis. From a careful consideration of the whole of the testimony we are unable to say the assets of the old company were not, at the time it was superseded by the new, fully equal to its liabilities; but if they were not, it is difficult to perceive upon what legal hypothesis the creditors of the present company can be affected by that fact. By a resolution of the board of directors of the new company, its president was directed to purchase the effects of the old company at $45,000, which was accordingly done, and by a mutual arrangement between all parties interested, this $45,000 was paid by taking up and discharging the notes of the old company to that amount. In all this we do not see the slightest evidence of bad faith or unfair dealing.

It is also urged that a large portion of the stock of the present company is colorable and fictitious,—that the subscribers, in some instances, were notoriously insolvent, and in others it was expressly understood that payment was not

expected or to be exacted, in other cases only a part of the subscription was to be paid, and in some instances payment was to be made in services of some kind instead of money. While it must be conceded there is some evidence tending to establish this claim, yet there are two sufficient reasons why it can not avail here:   In the first place, it is clear that the creditors of the company can not be affected by mere private understandings between the subscriber and the subscription agent of the company, by which the former is exonerated from the performance of that which his subscription, by its very terms, plainly requires.   To permit such a thing would be to sanction a palpable fraud upon the creditors of the company and the other stockholders.   In the next place, we do not regard either of the appellants in a position to question this matter, even if it constituted a defence.   It was by the court referred to the master for his consideration, and his report shows the total amount due from solvent subscribers, including the subscriptions of appellants, and no objections were made to that report before the master, and no exceptions were taken to it after it was filed in court, except by White, and, under the circumstances, he is in no better position than the others, for it is well settled that where matters of fact are referred to a master for his determination, it is the duty of the parties, when notified, as was done here, to appear before him and there contest the matter, and if his findings are not, in their judgment, supported by the evidence, it is their duty to interpose their objections, so as to afford the master an opportunity to modify his report if it should happen to be wrong; and if in such case, after hearing the objections, the master declines to modify or change his report, it is the duty of the objecting parties, after it has been filed in court, to appear there and file exceptions to it; and when this course has not been pursued, and no sufficient reason is assigned for not doing so, as was the case here, the report of the master, when approved by

the court, will be deemed in this court conclusive upon the questions covered by it.   *Hurd* v. *Goodrich*, 59 Ill. 450; *Pennell* v. *The Lamar Ins. Co.* 73 id. 303.

The fact that Willard was a man of limited means, and was a large subscriber to the enterprise, we regard, under the peculiar circumstances of this case, of no significance.   It was a matter of public notoriety that he was chief editor of the "Post," and president and general manager of the old company, and it can hardly be doubted that all who subscribed to the new enterprise knew that it was intended to supersede the old company in the same business, and that one of its chief objects was to make the "Post" a success, and establish it upon a solid basis; and there is just as little doubt that the subscribers looked more to the personal qualifications of Willard, as editor of the paper and general manager of the business, for the accomplishment of those objects, than to his subscription to the capital stock.   While it satisfactorily appears that in his great anxiety to perfect the new organization for the accomplishment of the objects just stated, he entered into private agreements with some of the subscribers which were inconsistent with the contract of subscription actually signed by them, and were therefore inoperative and void as to other subscribers and creditors of the company, yet in the light of all the facts before us we have no idea that any actual fraud was intended.   In view of the fact that death has closed his lips so that he can not now speak for himself, it is more charitable to suppose that these things were attributable rather to an honest belief that the final success of the enterprise would make all things right, than to a deliberate purpose to injure or wrong any one. However this may be, we are satisfied none of these things furnish a sufficient reason for reversing the judgment in this case, and it will therefore be affirmed.

*Judgment affirmed.*